FILED & ENTERED

MAY 16 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY RUST          DEPUTY CLERK

# NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>CYNTHIA JOAN MARCUS,<br><br>Debtor.<br>_____ | Case No. 9:12-bk-12397-PC<br><br>Chapter 7<br><br>Adversary No. 9:13-ap-01190-PC |
| RICHARD MARCUS and<br>ELIZABETH MARCUS,<br><br>Plaintiffs,<br><br>v.<br><br>CYNTHIA JOAN MARCUS,<br><br>Defendant.<br>_____ | **MEMORANDUM DECISION**<br><br>Date:   April 15, 2016<br>Time:   9:00 a.m.<br>Place:  United States Bankruptcy Court<br>        Courtroom # 201<br>        1415 State Street<br>        Santa Barbara, CA 93101 |

Richard Marcus ("Richard") and Elizabeth Marcus ("Elizabeth") seeks a judgment

against their sister, Cynthia Joan Marcus ("Cynthia") in the total amount of $78,909.20, plus

attorneys' fees and costs of court, and a determination that the debt is nondischargeable under 11

U.S.C. §§ 523(a)(a)(4) and (a)(6).[1]  Trial of this adversary proceeding was commenced and

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the
Bankruptcy Code, 11 U.S.C. §§ 101-1330.  "Rule" references are to the Federal Rules of
Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil

concluded on April 15, 2016.  Having considered the parties' Joint Pre-Trial Stipulation, the evidentiary record and argument of counsel, the court will enter a judgment in favor of Richard and Elizabeth against Cynthia based upon the following findings of fact and conclusions of law made pursuant to F.R.Civ.P. 52(a), as incorporated into FRBP 7052.

## I. STATEMENT OF FACTS

Richard, Cynthia and Elizabeth are the children of Harold Marcus ("Harold"), who passed away on March 9, 1991.  Harold left a will executed on April 22, 1986.  Lester J. Tanner ("Tanner") was appointed executor of Harold's estate.  During the administration of Harold's estate, Harold's surviving spouse, Elizabeth Atwood-Marcus and Richard, Cynthia and Elizabeth executed a Compromise Agreement which provided, in pertinent part, that after distribution to Elizabeth Atwood-Marcus of the property identified in the agreement, the residuary of Harold's estate would be divided equally among Richard, Cynthia and Elizabeth.

On or about August 6, 2010, Cynthia received a letter from the Keane Organization ("Keane") advising her that Keane had located an asset of Harold's estate and that it would reveal the location of the asset to her upon payment of a commission equal to 35% of the value of the asset.  Richard and Elizabeth receive a similar letter from Keane.  Richard, Cynthia and Elizabeth declined to pay the fee.  However, Cynthia commenced an independent investigation to locate the asset.

On November 9, 2011, Cynthia advised Tanner that she had convinced Keane to disclose the location of the asset.  It was a fund in the possession of Crederian Fund Services LLC ("Crederian") in the principal sum of $59,181.97 ("the Subject Funds").  On November 15, 2011, Cynthia notified Peg Moulder ("Moulder") of Crederian by email that Tanner was the executor of Harold's estate and provided Moulder with Tanner's contact information.  Cynthia sent a copy of the email to Tanner.

Procedure ("F.R.Civ.P.").  "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

On November 15, 2011, Tanner sent an email to Moulder to confirm that he was the executor of Harold's estate and to advise her that letters testamentary had been issued authorizing him to take possession of the Subject Funds on behalf of the estate.  On November 16, 2011, Moulder sent an email to Tanner, with a copy to Cynthia, acknowledging Tanner's November 15th email and providing Tanner with Moulder's contact information at Crederian.

On November 16, 2011, Tanner sent a letter to Moulder (by email and Federal Express), with a copy to Cynthia, enclosing an Affidavit of Domicile of Harold Marcus, a certified copy of the death certificate for Harold Marcus, letters testamentary, and an IRS Notice of Federal Tax Identification Number.  In the letter, Tanner advised Moulder that the account should be registered and all payments made to the Estate of Harold Marcus which maintained Account No. 483035773440 at Bank of America on North Avenue in New Rochelle, N.Y. (routing number 021000322).  That day, Moulder responded by email to Tanner, with a copy to Cynthia, asking whether she should use his home or office address and stating:

> Thank you for the documents.  I am awaiting to have the bank initiate the late return of the funds.  Once I receive those funds back into our account at State Street Bank we will wire the funds to the account indicated on your instruction letter.

Tanner replied to Moulder's email on November 16th, with a copy to Cynthia, advising Moulder that Moulder should use his home address of 175 Huguenot Street and home email address of lestanner18@gmail.com.

On May 24, 2012, Tanner, Moulder and Cynthia exchanged a series of emails.  Tanner sent a letter to Moulder (by email and first class mail), with a copy to Cynthia, stating:

> It has now been six months since we furnished to you all the documentation you requested to have Dr. Harold Marcus' funds restored to his Estate.  On January 13, 2012 you informed Cindy Marcus and me that the Federal Reserve would take time to finalize the refund and you will keep us posted.  No information has come to me since that date.  Please advise when the refund will be obtained.

Moulder responded by email to Tanner, with a copy to Cynthia, stating:

> I received your letter.  I wired the funds to Cindy on January 20, 2012.  Cindy also confirmed receipt of those funds.

3

Three minutes later, Cynthia sent an email to Tanner, stating: "I already received the funds."

Tanner responded: "What happened to the funds." Cynthia replied:

> She wired them to me. I still have not received the funds from my sister from my mother's estate and both my sister and brother are getting the return from the Palmer tennis club and they have cut me out of that so we are not quite even yet. I received a letter from my sister's attorney after my mother died to not talk to her about my mother's estate so I haven't spoken to her since then.

On May 31, 2012, Tanner emailed Moulder stating: "As Executor of the Harold Marcus Estate, please inform me as to the date, the payee and the amount of the check you disbursed to Cindy Marcus for the funds belonging to the Estate of Harold Marcus and a copy of the check." Moulder responded by email later that day stating:

> A wire was sent to Cindy Marcus for the full amount due for the checks. I confirmed her receipt of the wire in January and she also advised me the other day that she called you regarding your correspondence as this is a closed issue.

Tanner again requested from Moulder by email on May 31st "'the full amount due for each of the checks' and the amount of the wire to Cindy Marcus." Moulder immediately replied: "Please contact Cindy as she is the authorized individual on this account."

> On May 31, 2012, Tanner sent a letter to Moulder (by email and first class mail) stating:

> On November 16, 2011, I sent you by email and Federal Express a Letter of Instructions indicating how the Account for Unclaimed Funds of Harold Marcus at Reserve Funds should be registered. I enclosed (i) an Affidavit of Domicile providing the information with respect to Harold Marcus, M.D., (ii) a copy of the death certificate, (iii) Letter Testamentary appointing me as the sole Executor and (iv) the IRS Notice of the Estates Federal Identification Number.

> **I specifically stated that "The Account should be registered and all payments should be made to "The Estate of Harold Marcus." I expressly requested that you keep me informed of progress in recovering Dr. Marcus's unclaimed funds.**

> I have learned on May 24, 2012 in response to my letter that you wired the funds to Cindy Marcus on January 20, 2012. Why was I not informed that the Estate's funds were recovered? Why did you disburse the funds to Cindy Marcus instead of the Estate of Harold Marcus? Why do you not inform me now of the full amount of funds which was wired to Cindy Marcus instead of The Estate of Harold Marcus? Cindy Marcus was not the proper authorized individual on this account and was not the only residuary beneficiary of the Estate.

In response to the letter, Tanner was informed by Crederian that the refund amount was

$59,181.97 and that it was wired by Crederian on January 20, 2012, into the account of Cynthia

Marcus at Santa Barbara Bank & Trust, Account No. 010271271, at 1483 E. Valley Road,

Montecito, CA 93108.

On June 7, 2012, Tanner wrote a letter to Richard, Cynthia and Elizabeth advising them

that he had closed his file and the bank account for the Estate of Harold Marcus.  In the letter,

Tanner stated:

> Harold was a college classmate, client, close friend and confidante of mine for
> many years and he entrusted me to act as his Executor and resolve any conflict
> between his three children and Liz Atwood, his second wife and widow.  This was
> achieved in 1994 and I was unaware until recently that there was any discord
> between Cindy and her siblings. . . .
>
> Harold would not wish to see his children fighting over the money that was
> incorrectly paid to Cindy instead of the Estate.  I am recommending to each of
> you that this matter be resolved as follows:

| | | |
|---|---|---|
| Amount Received | | $59,181.97 |
| Pay to Lester J. Tanner (fee) | $3,267.97 | |
| Pay to Cindy for recovery services | <u>13,914.00</u> | (17,181.97) |
| Pay to $14,000 to each of the 3 children | | <u>$42,000.00</u> |

> To Cindy I say that there is a fair chance that you may have forfeited your right to
> share in the recovery.  My recommendation is fair to everyone in view of Cindy's
> saving the 35% fee requested by Keene.
>
> To Richard and Elizabeth I say that you should address Cindy's inquiries about
> her mother's Estate by informing her of the contents of Harriet's Will if Cindy
> does not already have a copy; and by referring her to the Owner/Manager of the
> New Rochelle Tennis Facility (is that Miles Stuchin?).

Following receipt of Tanner's letter, Richard advised Tanner that Elizabeth and Richard would

accept one third of the Subject Funds after payment of his $3,267.97 fee, but they would not

agree to the proposed fee to Cynthia for recovery services.  There was no evidence that their

proposal was communicated by Tanner to Cynthia.  Cynthia did not make any effort to contact

Richard or Elizabeth concerning the proposal contained in Tanner's letter regarding the Subject Funds nor did Richard and Elizabeth make any effort to contact Cynthia.

Fourteen days later, Cynthia filed a voluntary petition under chapter 7 in Case No. 9:12-bk-12397-RR, In re Cynthia Joan Marcus, Debtor.[2]  Jerry Namba ("Namba") was appointed as trustee.  Neither Richard nor Elizabeth were listed as creditors in Cynthia's schedules nor were they given notice of Cynthia's bankruptcy case.  A meeting of creditors was commenced on July 30, 2012, and concluded on October 1, 2012.  On October 4, 2012, Namba filed a report of no assets.  Cynthia received a discharge on October 9, 2012, and the case was closed on October 30, 2012.

On February 5, 2013, Richard and Elizabeth filed a petition against Cynthia in Case No. 1415417, In re Harold Marcus, in the Superior Court of California, County of Santa Barbara, pursuant to Probate Code § 850 seeking an order that Cynthia turn over monies equal to their respective one-third ownership in the Subject Funds, plus twice the value of the amount recovered under Probate Code § 859.  On August 29, 2013, the state court denied Cynthia's motion to change venue of the action to the state of New York.

By letter dated October 9, 2013, Cynthia, through counsel, demanded an immediate dismissal of the pending state court action as violating the discharge injunction in her chapter 7 case.  In response to the letter, Richard and Elizabeth, who were unaware that Cynthia had received a discharge in bankruptcy, moved to reopen her bankruptcy case to proceed with this adversary proceeding.

On November 14, 2013, Richard and Elizabeth filed the complaint against Cynthia in the above referenced adversary proceeding seeking a judgment for $78,909.20, together with

---

[2] This was Cynthia's third bankruptcy case.  Cynthia filed a voluntary chapter 7 petition in Case No. 9:12-bk-10056-RR, In re Cynthia J. Marcus, Debtor, on January 5, 2012.  The case was dismissed for cause on January 20, 2012, due to her failure to file the requisite schedules and statements.  Cynthia filed a second voluntary chapter 7 petition in Case No. 9:12-bk-11204-RR, In re Cynthia Joan Marcus, Debtor, on March 22, 2012.  The case was dismissed for cause on June 20, 2012, due to her failure to appear at the creditors' meeting.  This third chapter 7 case was commenced the following day – June 21, 2012.

accrued interest, attorneys' fees and costs, and a determination that the debt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).[3]  Cynthia filed her answer to the complaint on December 15, 2012.  After a trial on April 15, 2016, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) and (O).[4]  Venue is appropriate in this court.  28 U.S.C. § 1409(a).  Objections to the dischargeability of a debt are literally and strictly construed against the objector and liberally construed in favor of the debtor.  See  Quarre v. Saylor (In re Saylor), 108 F.3d 219, 221 (9th Cir. 1997).

A.  Section 523(a)(3(B).

Section 523(c)(1) states:

> Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section.

11 U.S.C. § 523(c)(1).  Section 523(a)(3)(B) further states:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –

---

[3]  Richard and Elizabeth dropped their claim under 11 U.S.C. § 523(a)(2)(A) in the Joint Pre-Trial Stipulation ("Trial Stip.").

[4]  Although it does not appear that any of the claims made the basis of the complaint constitute "Stern claims," the parties at trial nevertheless expressly consented to the entry of a final judgment by the bankruptcy court.  "Stern claims," so named after the Supreme Court's decision in Stern v. Marshall, ___ U.S., ___, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), "are claims 'designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter.'"  Mastro v. Rigby, 764 F.3d 1090, 1093 (9th Cir. 2014) (citation omitted).

(3) neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit –

(B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, . . . timely request for a determination of discharge of such debt, unless such creditor had notice or actual knowledge of the case in time for such timely . . . request.

11 U.S.C. § 523(a)(3)(B).

On the petition date, Richard and Elizabeth each held a disputed unsecured claim against Cynthia for an undivided one-third of the Subject Funds as residuary beneficiaries of the Estate of Harold Marcus.  Neither Richard nor Elizabeth was listed in Cynthia's Schedule F filed on June 21, 2012, as the holder of a disputed unsecured claim against Cynthia on the date of bankruptcy.  Nor were either Richard or Elizabeth served with a copy of the Notice of Chapter 7 Bankruptcy Case, Meeting of Creditors, and Deadlines issued by the clerk of court on June 21, 2012, according to the certificate of notice filed on June 23, 2012.  According to the parties Joint Pre-Trial Stipulation, Cynthia "does not contend that [Richard and Elizabeth] had sufficient knowledge of the filing by [Cynthia] of her chapter 7 bankruptcy, case number 12-BK-12397-RR, with sufficient time to file an adversary proceeding."[5]  There was no evidence to the contrary.

B.  Choice of Law.

Richard and Elizabeth assert that they have standing under California law as beneficiaries of the Estate of Harold Marcus to recover their share of the Subject Funds allegedly misappropriated by Cynthia from the estate; and that they are entitled to the remedies afforded under California law for such alleged misappropriation, including that provided under California Probate Code § 859.  Cynthia disagrees, arguing that New York is the situs of the Harold Marcus estate; and under New York law, Richard and Elizabeth neither have standing to pursue their

---

[5] Trial Stip., at 5:17-19.

claims nor the right to seek "recovery of other than normal compensatory damages in a conversion action with respect to misappropriated property of a decedent's estate."[6]

The Ninth Circuit directs bankruptcy courts to apply federal choice of law rules in federal question cases with exclusive jurisdiction in federal courts. <u>Lindsay v. Beneficial Reinsurance Co. (In re Lindsay)</u>, 59 F.3d 942, 948 (9th Cir. 1995) ("In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules."). Bankruptcy courts have exclusive jurisdiction to determine whether a debt in a bankruptcy case is non-dischargeable under § 523(a)(4) or § 523(a)(6) of the Bankruptcy Code. <u>See, e.g.</u>, <u>McGhan v. Rutz (In re McGhan)</u>, 288 F.3d 1172, 1179 n.9 (9th Cir. 2002) ("Dischargeability of a debt under § 523(a)(6) is a core proceeding, over which federal courts possess exclusive jurisdiction." (citations omitted)); <u>Rein v. Providian Fin. Corp.</u>, 270 F.3d 895, 904 (9th Cir. 2001) ("Bankruptcy courts have exclusive jurisdiction over nondischargeability actions brought pursuant to 11 U.S.C. § 523(a)(2), (4), (6) and (15).").  This court will apply federal choice of law rules.

"Under federal choice of law rules, the applicable substantive law is that of the jurisdiction having the greatest interest in the litigation." <u>In re Artimm, S.r.L.</u>, 335 B.R. 149, 164 (Bankr. C.D. Cal. 2005) (citing <u>Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.)</u>, 961 F.2d 341, 350 (2d Cir. 1992)). "The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy, and determine which jurisdiction's laws and policies are implicated to the greatest extent." <u>Koreag</u>, 961 F.2d at 350. After application of the interest analysis, "the trier of fact looks to state law to determine whether there is liability and the amount of compensatory and punitive damages and then the trier of fact determines whether that set of facts qualifies as a nondischargeable claim under the bankruptcy law." <u>Klause v. Thompson (In re Klause)</u>, 181 B.R. 487, 492 (Bankr. C.D. Cal. 1995).

---

[6] Defendant's Trial Brief, 15:28-16:2.

In this case: (1) Cynthia resides in California; (2) Cynthia sent and received emails from California seeking recovery of the Subject Funds; (3) Cynthia received the Subject Funds in California by wire transfer into California; (4) Cynthia retained the Subject Funds in California; (5) Cynthia filed each of her three bankruptcy cases in California, including the instant chapter 7 bankruptcy case; (6) Cynthia's chapter 7 bankruptcy estate was administered in California; (7) Cynthia received a discharge in California; (8) Richard and Elizabeth filed suit against Cynthia in a California state court seeking recovery of the Subject Funds; and (9) Richard and Elizabeth commenced this adversary proceeding in Cynthia's bankruptcy case seeking a determination that undisclosed debts attributable to Cynthia's retention of the Subject Funds are nondischargeable. Under the circumstances, the court finds that California has the greatest interest in resolving this litigation and will look to the applicable substantive law of California.

C.   Standing.

Section 850(a)(2)(D) of the California Probate Code states:

(a)  The following persons may file a petition requesting that the court make an order under this part:

(2) The personal representative or any interested person in any of the following cases:

(D) Where the decedent died having a claim to real or personal property, title to or possession of which is held by another.

Cal. Prob. Code § 850(a)(2)(D) (emphasis added).  "Interested person" includes "[a]n heir, devisee, child, spouse, creditor, beneficiary, and any other person having a right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding."  Cal. Prob. Code § 48(a)(1).  Richard and Elizabeth, as residuary beneficiaries of the Estate of Harold Marcus, "presumptively qualif[y] to initiate a proceeding under section 850."  See Lissoy v. Leach (Estate of Myers), 139 Cal.App.4th 434, 441 (2006) ("Lissoy, as a creditor of Myers' estate, presumptively qualifies to initiate a proceeding under section 850.").  Furthermore, Richard and Elizabeth each held a "claim against the debtor that arose at the time of or before the order for relief" in Cynthia's chapter 7 case, and as such, were creditors of Cynthia's bankruptcy

10

case.  See 11 U.S.C. § 101(10)(A).  Each hold a disputed unsecured claim against Cynthia for an

undivided one-third of the Subject Funds as residuary beneficiaries of the Estate of Harold

Marcus, and have standing as creditors of Cynthia's bankruptcy estate to seek a determination

that such claims are nondischargeable under 11 U.S.C. § 523(a)(4) or (a)(6).

D.  Section 523(a)(4).

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in

a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).  "The definition of

larceny for § 523(a)(4) purposes is a matter of federal law."  Kaye v. Rose (Matter of Rose), 934

F.2d 901 (7th Cir. 1991).  Larceny occurs only when the debtor first comes into unlawful

possession of the property of another.  Werner v. Hoffman, 5 F.3d 1170, 1172 (8th Cir. 1993);

Rose, 934 F.2d at 904.  Whether larceny requires fraudulent intent appears to be an open

question in the Ninth Circuit.  Compare Ormsby v. First Am. Title Co. (In re Ormsby), 591 F.3d

1199, 1205 (9th Cir. 2010) ("We make no determination concerning whether federal law requires

a finding of fraudulent intent for larceny . . . .") with Rose, 934 F.2d at 903 ("Larceny is proven

for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property

from its owner.").

In Ormsby, the Ninth Circuit stated that federal common law "defines larceny as a

'felonious taking of another's personal property with the intent to convert it or deprive the owner

of the same.'" Ormsby, 591 F.3d at 1205 (citation omitted)).[7]  "Felonious is defined as

_____

[7]  In California, "[c]onversion is . . . the wrongful exercise of dominion over the personal
property of another." Fremont Indem. Co. v. Fremont Gen. Corp., 148 Cal.App.4th 97, 119
(2007).  "The elements of a conversion are:  (1) the plaintiff's ownership or right to possession of
the property; (2) the defendant's conversion by a wrongful act or disposition of property rights;
and (3) damages." Burlesci v. Petersen, 68 Cal.App.4th 1062, 1066 (1998).  "The foundation of
the action rests neither in the knowledge nor the intent of the defendant." Id.  "Instead, the tort
consists in the breach of an absolute duty; the act of conversion itself is tortious." Id.
"Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily
immaterial." Id. "The Judiciary Committee House Report on the Bankruptcy Reform Act of
1978 explains that the intent of section 523(a)(4) is to include 'conversion under which the
debtor willfully and maliciously intends to borrow property,' even without the intent to inflict

'proceeding from an evil heart or purpose; malicious; villainous . . . Wrongful; (of an act) done without excuse or color of right.'" Id. at 1205 n.4 (citations omitted).  "Intent may property be inferred from the totality of the circumstances and the conduct of the person accused."  Rose, 934 F.2d at 904.

In this case, Cynthia knew that the Subject Funds belonged to the Estate of Harold Marcus.  She knew that she had to disclose the Subject Funds to Tanner and that the Subject Funds needed to be paid to Tanner, as Executor of the Estate of Harold Marcus, to be administered as an asset of the estate.  She had previously discovered $17,000 belonging to the Estate of Harold Marcus.  She recovered and immediately turned those funds over to Tanner. Cynthia knew that Tanner (1) had made demand on Crederian for payment of the Subject Funds to the estate; (2) had provided Crederian with all documentation and instructions necessary for a wire transfer of the Subject Funds to the estate's account at Bank of America in New Rochelle, New York; and (3) was expecting a wire transfer of the Subject Funds from Crederian after the email exchange on November 16, 2011.  Inexplicably, Crederian wired the Subject Funds to Cynthia, not Tanner, on January 20, 2012.

There is no evidence of communications between Cynthia and Crederian between November 16, 2011 and January 20, 2012, other than Cynthia's testimony that Moulder telephoned her, stated that she had her money, and requested wiring instructions to Cynthia's personal bank account.  Cynthia denies contacting Moulder or requesting the payment of any portion of the Subject Funds directly to her.  When she was contacted by Moulder, however, Cynthia did not tell Moulder to wire the Subject Funds to Tanner as directed by Tanner in the email exchange on November 16, 2011, nor did she question at all why Moulder intended to wire the Subject Funds to her, not Tanner, given the prior email exchange.  Cynthia received the funds directly from Crederian without objection by wire transfer into her personal account at Santa Barbara Bank & Trust in Montecito, California.  Cynthia not only kept the Subject Funds for her

injury.  H.R.Rep. No. 95-595, at 364 (1977)."  Ormsby v. First Am. Title Co. (In re Ormsby), 386 B.R. 243, 250 (E.D. Cal. 2008), aff'd, 591 F.3d 1199 (9th Cir. 2010).

own use and benefit, but concealed receipt of the Subject Funds from Tanner and her siblings for a period of four months.  It was only after Tanner contacted Crederian on May 24, 2012, regarding the status of the funds that Cynthia finally disclosed to Tanner that she had received the Subject Funds four months earlier.  She then refused to turnover the Subject Funds to the estate.[8]

Cynthia admits that she appropriated the Subject Funds.  She admits that she received the Subject Funds from Crederian on January 20, 2012, and, "rather than transmitting the fund to executor Tanner, [she] appropriated the [Subject Funds] for her own use and benefit, keeping her own $20,000 share, as well as the $40,000 that should have been disbursed equally to Elizabeth and Richard."[9]  Cynthia denies, however, that she did so "with an intent to steal the $40,000 share of her siblings."[10]  Cynthia asserts that she was justified in appropriating her siblings' share of the Subject Funds and that she did so under "color of right."[11]

---

[8] At trial, Cynthia's counsel conceded that she should have turned the Subject Funds over to Tanner, stating:  "Yes.  If you follow the exact law, that's what she should have done, and that's what she did with the $17,000 and if Moulder had done what Tanner had instructed her to do, she should have sent him the money.  She didn't, for whatever her reason was."

[9] Defendant's Trial Brief, 2:4-7.

[10] Id. at 2:25-26.

[11] Id. at 2:8; 4:11.  In her trial brief, Cynthia cites Aloha Consolidators Int'l v. U.S., 395 F.Supp. 1006 (C.D. Cal. 1975).  Defendant's Trial Brief, 11:6-7.  In that case, Aloha Consolidators International ("Aloha") appealed an order of the Interstate Commerce Commission ("ICC") claiming that the ICC abused its discretion in permitting Harry H. Blanco & Co ("Blanco") to operate as a freight forwarder of general commodities.   According to the evidence, Blanco had engaged in the business of a non-vessel operating common carrier since 1965 under the authority of the Federal Maritime Commission, but at the same time had operated illegally as a freight forwarder without a license.  The evidence also revealed, however, that Blanco had operated as a freight forwarder in good faith and "color of right," and that Blanco obtained the proper forwarding license after being instructed to do so by the ICC.  The court dismissed Aloha's application finding that the ICC had not abused its discretion and that its decision was supported by substantial evidence.  While Aloha does use the term "color of right," Aloha does not define "color of right" nor stand for Cynthia's proposition that "'[c]olor of right' means 'reasonable

13

Cynthia has given various reasons for keeping the Subject Funds. After the adversary proceeding was commenced, Cynthia claimed that she needed the money because she was in dire financial straits in January 2012 due to mounting medical and dental bills attributable to mercury poisoning caused by faulty dental work. Shortly before trial, Cynthia claimed that she kept the Subject Funds following a discussion with legal counsel after receiving the money. Neither of these reasons was mentioned in Cynthia's email to Tanner on May 24, 2012, in which she stated as the <u>sole reason</u> for keeping the Subject Funds, the following:

> I still have not received the funds from my sister from my mother's estate and both my sister and brother are getting the return from the Palmer tennis club and they have cut me out of that so we are not quite even yet.

Whatever her reason, Cynthia's retention of the Subject Funds was not justified.

First, Cynthia was not entitled to the Subject Funds. She did not have a present right to any portion of the Subject Funds on January 20, 2012. She had, at best, a mere expectancy that she would receive from Tanner, as a residuary beneficiary of the Estate of Harold Marcus, a distribution of one-third of the Subject Funds from the estate after costs of administration.

Second, there is no evidence that either Elizabeth or Richard on or before January 20, 2012, were seeking to "cut" Cynthia out of their mother's estate. Cynthia testified that "Richard was very hostile and abusive" and that she was convinced Richard was working with Elizabeth, as executrix of the Harriet Marcus estate, to deprive her of distributions from her mother's estate. She testified that "he would give advice to Liz and Liz would listen to him; and when Liz stopped talking to me, I just felt like he was behind it." She further testified that she kept the Subject Funds because "they had control over my mother's money – over $200,000 that was supposed to go to my benefit and they could have reimbursed themselves out of that; and had they given me that money, I wouldn't have needed this $59,000 because I would have had it but they kept it from me and I needed the money."

---

claim of right,' such that even if an actor's conduct was illegal, if he acted under color of right he is deemed to have acted in good faith.'"

14

The Subject Funds were no more Cynthia's to keep from the Estate of Harold Marcus than the $200,000 anticipated distribution from Cynthia's mother's estate into her spendthrift trust was hers to give away.  Harriet Marcus, the mother of Cynthia, Richard and Elizabeth, died in October 2010.  Elizabeth was appointed as executrix under the Last Will and Testament of Harriet Marcus dated March 23, 2010.  In conjunction with her will, Harriet executed the Harriet Marcus Revocable Trust ("Trust") dated March 23, 2010, under the terms of which Elizabeth, as successor trustee, was instructed to distribute the balance of the trust estate upon the death of Harriet Marcus, as follows: (a) 30% in trust for the benefit of Cynthia; (b) 20% in trust for the benefit of Richard; and (c) 50% in trust for the benefit of Elizabeth.  The Trust named Sally Beaudry ("Beaudry") as trustee of the spendthrift trust created specifically for Cynthia.  Cynthia testified that Beaudry was a friend she had known for over 20 years.  Beaudry was also an attorney.

Prior to January 2012, Cynthia learned that Elizabeth, as executrix and trustee of the Trust, had made a $50,000 distribution to the spendthrift trust created for Elizabeth under the Trust.  On January 20, 2012, Cynthia knew only that she had not received a distribution from the Trust.  She also had no basis in fact to believe that a distribution had been made to Richard's spendthrift trust.

Cynthia's unfounded speculation regarding secret distributions to Richard and Elizabeth from her mother's estate was exacerbated by the fact that Cynthia had stopped talking to both Richard and Elizabeth by January 20, 2012.  It was undisputed that Richard and Cynthia had not spoken to each other in over ten years.  Elizabeth and Cynthia communicated with one another prior to Harriet's death, and continued to do so after Elizabeth was appointed as executrix of their mother's estate.  At some point, however, Elizabeth stopped returning Cynthia's phone calls after having received advice from Cynthia on estate administration, such as tax and real estate sales issues.  Cynthia then received a letter from counsel for the Estate of Harriet Marcus advising her to direct to the firm all future communications regarding the administration of the estate.  Notwithstanding the letter, Elizabeth continued to communicate with Cynthia on other

matters sending her emails on holidays, such as Christmas.  Cynthia then ceased further communications with Elizabeth, testifying that she found the emails from Elizabeth "hurtful."

There is no credible evidence that either Elizabeth or Richard sought to "cut" Cynthia out of her share of the trust estate.  In fact, it became apparent at trial that the reason Cynthia's spendthrift trust had not received a distribution from the Trust was Beaudry's failure to execute an acceptance of her appointment as trustee of Cynthia's spendthrift trust.  The Trust made a distribution to Cynthia's spendthrift trust once Beaudry executed an Acceptance of Appointment of Trustee on March 15, 2016, and obtained a tax identification number for the trust from the IRS.

Nor is there credible evidence that either Elizabeth or Richard sought to "cut" Cynthia out of an interest in the tennis club.  Miles M. Stuchin ("Stuchin") testified by deposition on rebuttal that:

1.  He is a co-managing member of the New Rochelle Racquet Club, LLC ("New Rochelle") and a co-managing member of Rock and Racquet Realty, LLC ("Rock & Racquet").

2.  New Rochelle owns and operates a six-court tennis facility in New Rochelle, New York, and is also an 80% owner of an attached property known as The Rock Club, which is an indoor rock climbing facility.

3.  Rock & Racquet owns the land and building on which the tennis club, the racquetball courts, and The Rock Club are located.  The facilities pay rent to Rock & Racquet.  The owners and members of New Rochelle own interests in New Rochelle in the same percentages as the interests they own in Rock & Racquet.

4.  New Rochelle is a successor to Palmer-Cedar Indoor Racquet Club, Inc. ("Palmer-Cedar"), which was a "C" corporation for tax purposes.  Rock & Racquet originally was a general partnership.  To limit the personal liability of the Rock & Racquet partners and to reduce the tax liability of Palmer-Cedar, the two entities were converted to limited liability companies in approximately 2006.

5.  At his death, Harold Marcus owned a 10% interest in the two entities which was divided equally among his children, Cynthia, Richard and Elizabeth.

16

6.  When New Rochelle and Rock & Racquet were reorganized, the entities each received the consent of 96 2/3rds of its members to the reorganization.

7.  Cynthia objected to the reorganization.  She was treated as a dissenting stockholder and given appraisal rights for her interest in each entity upon reorganization.

8.  Cynthia's interest was designated as a 3.45 interest in the name of Richard G. Marcus Family Co., LLP in Schedule A of the Limited Liability Company Operating Agreement of New Rochelle Racquet Club, LLC and as a 3.45 interest in the name of Richard G. Marcus Family Co., LLP in Schedule A of the Limited Liability Company Operating Agreement of Rock and Racquet Realty, LLC.

9.  Neither Richard nor Elizabeth were involved in the decision by New Rochelle or Rock & Racquet to reorganize.  Each agreed to the reorganization and became members of the new entities.

10.  By email dated May 24, 2006, Stuchin made an offer to Cynthia on behalf of New Rochelle and Rock & Racquet to liquidate her appraisal rights for the sum of $53,866. Cynthia rejected the offer and did not make a counter offer.  She still owns equity in each of the entities subject to her appraisal rights.

Finally, Cynthia argues that her intent to appropriate the Subject Funds could not have been wrongful because she did so on the advice of her two attorneys, Beaudry and Jeff Barnes ("Barnes").  While a debtor's reliance on the advice of her attorney may be used to prove the debtor lacked the requisite intent, the debtor's reliance must be in good faith.  See, e.g., First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986) ("Generally, a debtor who acts in reliance on the advice of his attorney lacks the intent required to deny him a discharge. . . [but] the debtor's reliance must be in good faith." (citations omitted)); In re Mascolo, 505 F.2d 274, 277 (1st Cir. 1974) ("[A]n explanation by a bankrupt that he had acted upon advice of counsel who in turn was fully aware of all the relevant facts generally rebuts an inference of fraud.").

In this case, Cynthia injected advice of counsel into this adversary proceeding shortly before trial.  During discovery, Cynthia did not disclose Barnes as a person with knowledge of relevant facts either in response to interrogatories or pursuant to F.R.Civ.P. 26(a)(1)(A)(i).

Cynthia disclosed Beaudry as a potential witness during discovery, but refused to waive the attorney-client privilege as to communications with Beaudry at her deposition on August 22, 2014. Neither Beaudry nor Barnes testified at trial. There is no evidence of the actual communications between Cynthia and Beaudry or Cynthia and Barnes regarding the Subject Funds nor is there evidence that either attorney possessed all of the relevant facts before allegedly counseling Cynthia regarding the Subject Funds. In sum, there is insufficient evidence to support a finding that Cynthia either actually received advice of counsel regarding the Subject Funds or acted in reliance thereon in good faith.

Based on the foregoing, the court finds that Cynthia's appropriation of the Subject Funds constituted the felonious taking of personal property owned by the Estate of Harold Marcus. Cynthia's actions were wrongful and amounted to fraud. She received and retained the Subject Funds with the intent to convert or misappropriate such property to her own use and benefit. The weight of credible evidence belies the notion that Cynthia appropriated the Subject Funds with an honest belief that her action was justifiable. No reasonable person receiving the Subject Funds under the same or similar circumstances would have believed that the funds were hers to keep.

E.  Section 523(a)(6)

Section § 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Section 523(a)(6) requires a debt attributable to an intentional tort. See Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998).[12] "Willful" and "malicious" are separate elements. See In re Barboza, 545 F.3d 702, 711 (9th Cir. 2008). "[T]he willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury or the debtor believed that injury was substantially certain to occur as a result of his conduct." Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1208 (9th Cir. 2001); see Carrillo v. Su (In re Su), 290 F.3d 1140, 1145

---

[12]  The type of debts excluded from discharge under § 523(a)(6) "triggers in the lawyer's mind the category of intentional torts, as distinguished from negligent or reckless torts." Kawaauhau, 523 U.S. at 61-62. "Intentional torts generally require that the actor intend the consequences of an act, not simply the act itself." Id.

n.3 (9th Cir. 2002) ("§ 523(a)(6) nondischargeability [is limited] to those situations in which the debtor possesses subjective intent to cause harm or knowledge that harm is substantially certain to result from his actions."). "A 'malicious' injury involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" Jercich, 238 F.3d at 1209. "This four-part definition does <u>not</u> require a showing of biblical malice, i.e., personal hatred, spite, or ill-will." <u>Murray v. Bammer (In re Bammer)</u>, 131 F.3d 788, 791 (9th Cir. 1997).

The evidence supports a finding that Cynthia's conduct was willful. Cynthia converted the Subject Funds with the subjective intent to cause financial injury to the Estate of Harold Marcus and, in particular, Elizabeth and Richard, as residuary beneficiaries of the Estate of Harold Marcus. Cynthia's email to Tanner dated May 24, 2012, reveals Cynthia's intent to get "even" because she had not received a distribution from her mother's estate and had convinced herself that she was being cut out of the estate by her siblings. The evidence also supports a finding that Cynthia knew with substantial certainty that injury was likely to occur to the Estate of Harold Marcus as a result of her actions. She knew that the Subject Funds belonged to the Estate of Harold Marcus and that Tanner, as executor of the Harold Marcus estate  (1) had made demand on Crederian for payment of the Subject Funds to the estate; (2) had provided Crederian with all documentation and instructions necessary for a wire transfer of the Subject Funds to the estate's account at Bank of America in New Rochelle, New York; and (3) was expecting a wire transfer of the Subject Funds from Crederian after the email exchange on November 16, 2011. She accepted a wire transfer of the funds from Moulder without objection and then concealed receipt of the Subject Funds from Tanner and her siblings for four months.

Cynthia's conduct was also malicious. Having determined that Cynthia's conversion or misappropriation of the Subject Funds was willful, the court can infer malice based on the nature of the wrongful act. <u>Thiara v. Spycher Bros. (In re Thiara)</u>, 285 B.R. 420, 434 (9th Cir. BAP 2002). Cynthia's goal of correcting a perceived imbalance in distributions from her mother's estate did not provide her with just cause or excuse to misappropriate the Subject Funds from her father's estate for her own use and benefit. <u>See, e.g.</u>, <u>Jett v. Sicroff (In re Sicroff)</u>, 401 F.3d

1    1101, 1107 (9th Cir. 2004) ("Sicroff's goal of protesting the Geography Department's closure

2    did not provide just cause or excuse to calumniate Jett's professional reputation."), <u>cert. denied</u>,

3    545 U.S. 1139 (2005 ); <u>Murray v. Bammer (In re Bammer)</u>, 131 F.3d 788 (9th Cir. 1997) ("We

4    can think of no reason consistent with section 523 and the purposes of the Bankruptcy Code to

5    permit a standardless, unmeasureable, emotional, and nonlegal concept such as compassion to

6    negate an identifiably and <u>legally</u> wrongful act." (emphasis in original)).

7    F.    <u>Damages</u>

8          Section 859 of the California Probate Code states, in pertinent part:

9          If a court finds that a person has in bad faith wrongfully taken, concealed, or
10         disposed of property belonging to . . . the estate of a decedent . . , the person <u>shall</u>
           be liable for twice the value of the property recovered by an action under this part.

11   Cal. Probate Code § 859 (emphasis added).  "The statutory scheme's 'evident purpose' is to

12   carry out the decedent's intent and to prevent looting of estates."  <u>In re Estate of Kraus</u>, 184

13   Cal.App.4th 103, 111 (2010); <u>see</u> <u>In re Estate of Young</u>, 160 Cal.App.4th 62, 92 (2008)

14   ("[W]hen we analyze this statutory scheme, we must take into account its evident purpose, to

15   effectuate the intent of the decedent and to prevent looting of estates.").  "Once property is

16   recovered under Section 850, it becomes 'property belonging to . . . [the estate of a decedent]'

17   and a double recovery is available if the court then finds that the property was wrongfully taken

18   in bad faith."  <u>In re Pereira and Melo Dairy</u>, 325 B.R. 1, 5 (Bankr. E.D. Cal. 2005); <u>see</u> <u>Young</u>,

19   160 Cal.App.4th at 90 ("[T]he plain language of section 859 contemplates that a showing of

20   liability should be made before the damages phase begins, because a finding of bad faith taking

21   of an estate's property is anticipated, <u>along with an adjudication of a right to recovery of that</u>

22   <u>property</u>, before a damages assessment will be made of liability 'for twice the value of the

23   property recovered by an action under this part.'" (emphasis in original)).

24         Cynthia misappropriated the Subject Funds from the Estate of Harold Marcus.  She is

25   liable to Richard for his one-third share of the Subject Funds as a residuary beneficiary of the

26   estate.  She is also liable to Elizabeth for her one-third share of the Subject Funds as a residuary

27   beneficiary of the estate.  Richard is entitled to damages in the amount of $19,727.30 as a

28

residuary beneficiary of the Estate of Harold Marcus, and Elizabeth is entitled to damages in the amount of $19,727.30 as a residuary beneficiary of the estate.[13]  Pursuant to California Probate Code § 859, the court finds that Cynthia wrongfully converted and concealed the Subject Funds from the Estate of Harold Marcus in bad faith, and that she is liable to Richard and Elizabeth, as residuary beneficiaries of the estate, for twice the value of the amount recovered.  Having determined that Cynthia's misappropriation of the Subject Funds constituted a felonious taking of personal property owned by the Estate of Harold Marcus, Cynthia's debts to Richard and Elizabeth will be declared nondischargeable under § 523(a)(4).  Cynthia's debts to Richard and Elizabeth will also be declared nondischargeable under § 523(a)(6) because her misappropriation of the Subject Funds was willful and malicious.

E.  Attorneys' Fees.

Section 859 of the California Probate Code was amended in 2013 to further provide, in pertinent part, that:

> In addition, except as otherwise required by law, including Section 14657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs.

Cal. Probate Code § 859 (emphasis added).  "In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser."  Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 210, 247 (1975).  The policy underlying this "American Rule" with respect to attorney fees is that "since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included fees of their opponents' counsel.  Also, the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose

---

[13]  Had the Subject Funds been properly paid to the estate, Cynthia, Elizabeth and Richard as residuary beneficiaries would each have been entitled to one-third of the Subject Funds, less costs of administration.  The Subject Funds were not paid to the estate, and the estate has been closed.  No expenses of administration will be deducted from the Subject Funds.

substantial burdens for judicial administration." <u>Fleischmann Distilling Corp. v. Maier Brewing Co.</u>, 386 U.S. 714, 718 (1967) (citations omitted).

The American Rule applies in bankruptcy proceedings. <u>See</u> <u>Acequia, Inc. v. Clinton (In re Acequia, Inc.)</u>, 34 F.3d 800, 819 (9th Cir. 1994). "[N]o general right to receive attorney's fees exists under the Bankruptcy Code." <u>Fry v. Dinan (In re Dinan)</u>, 448 B.R. 775, 784 (9th Cir. BAP 2011). "[F]ederal courts must scrutinize the benefits conferred from litigation carefully . . . [and award] attorney's fees . . . 'in limited circumstances' absent a fee-shifting statute or contract." <u>Polonski v. Trump Taj Mahal Assocs.</u>, 137 F.3d 139, 146 (3d Cir. 1998) (quoting <u>Alyeska Pipeline</u>, 421 U.S. at 257-58). Even when a state statute authorizes an award of attorneys' fees, a federal court in light of the American Rule will "apply state attorney's fee law only when it 'embod[ies] a substantive policy.'" <u>Camacho v. Texas Workforce Comm'n</u>, 445 F.3d 407, 412 (5th Cir. 2006).

In this case, California Probate Code § 859 authorizes fee-shifting in the court's discretion. Section 859's fee-shifting provision is permissive, not mandatory. The trial briefs of the parties do not address the issue of whether the amendment of California Probate Code § 859 in 2013 to permit a discretionary award of attorneys' fees was procedural in nature or represents substantive policy. Given the strong policy considerations underlying the American Rule, the court declines in its discretion to award attorneys' fees.

///

///

///

///

///

///

///

///

22

CONCLUSION

For the reasons stated, the court will enter a judgment: (1) awarding Richard judgment against Cynthia in the amount of $39,454.60, together with interest at the federal rate after entry of judgment until paid; (2) awarding Elizabeth judgment against Cynthia in the amount of $39,454.60, together with interest at the federal rate after entry of judgment until paid; (3) declaring that each of the debts are nondischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6); and (4) awarding Richard and Elizabeth costs of court.  Each party will bear their own attorneys' fees.

A separate judgment will be entered consistent with this memorandum.

###

Date: May 16, 2016

Peter H. Carroll
United States Bankruptcy Judge